IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROYAL ALLIANCE ASSOCIATES, INC.,    )
                                    )
          Plaintiff,                )
                                    )
v.                                  )    1:08cv449 (LMB/JFA)
                                    )
BRANCH AVENUE PLAZA, L.P.,          )
                                    )
          Defendant.                )

NOV 2 0 2008

## MEMORANDUM OPINION

This declaratory judgment action arises from a dispute
between the defendant, Branch Avenue Plaza, L.P. ("Branch
Avenue"), and non-party United Securities Alliance, Inc. ("United
Securities"), a financial services firm and former member of the
Financial Industry Regulatory Authority ("FINRA"),[1] over an
investment that Branch Avenue alleges was induced through
fraudulent representations.  Two years after Branch Avenue made
the investment at issue, plaintiff Royal Alliance Associates,
Inc. ("Royal Alliance") purchased most of United Securities'
assets under an agreement that did not include the purchase of
United Securities' liabilities.  Branch Avenue has initiated an
arbitration proceeding under the FINRA rules against both United
Securities and Royal Alliance, claiming $3.9 million in damages.

Royal Alliance seeks both a declaration that it is not

---

[1]FINRA, until recently, was known as the National
Association of Securities Dealers (NASD).  Cases cited in this
opinion may refer to either organization, and the names may be
used interchangeably.

subject to the arbitration proceedings and an injunction
dismissing it from the pending arbitration and enjoining Branch
Avenue from pursuing any further claims against it in an
arbitration proceeding.  Both parties have moved for summary
judgment on the record before the Court.  For the reasons stated
below, summary judgment will be granted in favor of Royal
Alliance.

## I. Background

### A. Branch Avenue's Transaction with United Securities.

Defendant Branch Avenue is a limited partnership organized
under Maryland law with its principal place of business in
Virginia.  Compl. ¶ 6.  The only two partners are William and
Glaucia Allen, a married couple who set up the partnership in
1979 to purchase and manage a piece of commercial real estate.
Branch Avenue Plaza, L.P. v. United Securities Alliance, Inc. et
al., FINRA Dispute Arb. No. 08-00532, Statement of Claim
("Statement of Claim") (Compl. Ex. A) at 2.

The Allens sold the property in 2004 for net proceeds of
$5.6 million, intending to use the money from the sale to
generate retirement income.  Id.  They hired Gary Ackerman, a
registered representative of United Securities,[2] a Nevada

---

[2]Gary Ackerman left United Securities in November 2005.  Jt.
Stip. Undisp. Facts (hereinafter "Jt. Stip.") ¶ 23.  Ackerman has
never been a registered representative of Royal Alliance.  Id. ¶
22.

2

corporation, to advise them regarding the investment.  Id.  In December 2004, upon Ackerman's recommendation, Branch Avenue purchased a property in Indianapolis for a total price of $3.9 million, consisting of $1.9 million in cash and $2 million in loan assumptions.  Id. at 4-5.

According to Branch Avenue, Ackerman made multiple misrepresentations regarding the property, including its suitability for use as a warehouse, its viability as a rental property, the existence of a tenant who would pay $1 million in rent through 2019, and the ability of the rent to cover all of the property's expenses.  Id. at 3-4.  Branch Avenue contends that the fair market value of the property was only one-fourth or one-fifth of the sale price, much of the property was unsuitable for use as a warehouse and difficult to rent out, and Investment Properties of America ("IPA"), the seller of the property, was involved in a number of fraudulent activities.  Id. at 3-4.

Branch Avenue received monthly income payments from the property until August 2007, when the payments stopped and Ackerman and IPA's fraudulent activities came to light.  Id. at 5.  IPA was forced into bankruptcy and its assets, as well as the assets of its principal owner, were seized.  Id.  Branch Avenue has lost its investment and is still liable for the loans it assumed and additional expenses related to the property.  Id.

**B. United Securities' Transfer Agreement with Royal Alliance.**

3

On December 29, 2006, United Securities entered into a
Rights and Information Transfer Agreement ("Transfer Agreement")
(Compl. Ex. B) with the plaintiff, Royal Alliance.  Jt. Stip. ¶
3.  Royal Alliance is a Delaware corporation with its principal
place of business in New York.  Compl. ¶ 5.

Under the Transfer Agreement, Royal Alliance purchased
United Securities' entire retail broker-dealer operation, see
Transfer Agreement § 2, which constituted "substantially all of
the assets of United Securities," Def.'s Resp. Ex. 7 at RA-129.
The purchase price for those assets consisted of (1) an initial
cash payment, paid at closing, equal to five percent of United
Securities' revenues in 2006, and (2) two "earnout" payments,
paid after closing, based on the post-closing production of the
registered representatives who were transferred from United
Securities to Royal Alliance.  See Transfer Agreement § 2.2.  No
portion of the purchase price came in the form of shares of stock
in Royal Alliance.  See id.  Pursuant to the Transfer Agreement,
United Securities engaged in a "mass registration transfer of all
of its registered representatives to [Royal Alliance]," Def.'s
Resp. Ex. 7 at RA-129, and United Securities "effectively . . .
cease[d] operations as a retail broker-dealer," id. at RA-133.
However, certain components of United Securities, including
Branch Avenue's account with United Securities, were not
transferred to Royal Alliance.  Jt. Stip. ¶ 21.

4

Under the Transfer Agreement, Royal Alliance expressly did not agree to pay any of United Securities' liabilities "of any nature whatsoever," including any actions "arising out of, associated with, or relating to, any facts or circumstances regarding any of [United Securities'] customer accounts prior to the Closing Date." Transfer Agreement § 2.1(c). United Securities was required to remain in existence after the closing date, id. § 6.11, and to purchase $8 million in error and omissions tail insurance to cover claims related to it or its employees arising from conduct before the closing, and after the closing for at least six years, id. § 6.13. Finally, United Securities agreed to indemnify Royal Alliance for any liabilities, obligations, or claims resulting from events or circumstances arising before the closing. Id. § 9.2.

### C. The Current State of United Securities and its Relationship with Royal Alliance.

According to documents publicly filed over the past year, United Securities still exists and is operational, albeit as an investment advice and financial planning firm and not as a retail broker-dealer. A May 6, 2008 Certificate of Existence With Status in Good Standing, filed by the Nevada Secretary of State, certified that United Securities was a corporation in good standing as of that date. Jt. Stip. ¶ 9. On March 18, 2008, United Securities registered with the United States Securities and Exchange Commission ("SEC") as an "active investment adviser"

5

and filed a Uniform Application for Investment Adviser Registration ("Form ADV").  Id. ¶ 10.  In the Form ADV, United Securities stated that it had[3] between eleven and fifty employees and 900 clients, offered financial planning, portfolio management, and adviser selection services, and managed assets of approximately $100 million.  Id. ¶ 11, 15.[4]  In addition, according to the Form ADV, United Securities currently has eight owners, who are identified by name in the Form ADV.  Id. ¶ 16.

Although Royal Alliance and United Securities are separate legal entities, they maintain certain ties with each other. According to the Form ADV, United Securities is an "affiliate" of Royal Alliance, and twelve out of thirteen locations where United Securities documents and records are kept are offices of Royal Alliance.  See Form ADV (Compl. Ex. D) Items 1.K, 7.A and attached Schedules; see also Def.'s Resp. 10.  Certain registered representatives of Royal Alliance are also currently registered as investment advisors through United Securities.  Jt. Stip. ¶

---

[3]The figure for number of clients (900) refers to the number of clients during United Securities' "most recently completed fiscal year," Form ADV Item 5.C, which ended in December 2007, see id. Item 3.B.  Other relevant figures and assertions in the Form ADV are stated in the present tense and therefore are deemed to reflect United Securities' claims as to the state of its business on the date of the filing, March 18, 2008.

[4]Branch Avenue has asserted that United Securities' statement in the Form ADV are "not conclusive evidence of their truth," Def.'s Resp. 4, but offers no further explanation or evidence that the statements are untrue.

26.   In addition, pursuant to the Transfer Agreement, two of the individuals listed in the Form ADV as owners of United Securities, Michael Jones and Patrick Sutherland, were appointed as managing executives in Royal Alliance's broker-dealer network. See Def.'s Resp. Ex. 7 at RA-129.

### D. The Arbitration Proceeding and the Current Action.

On February 22, 2008, Branch Avenue filed a Statement of Claim and instituted arbitration proceedings before FINRA against Ackerman, United Securities, and Royal Alliance, seeking total damages of over $3.9 million.  See Jt. Stip. ¶ 1; see also Statement of Claim at 15.  Royal Alliance is a member of FINRA. Jt. Stip. ¶ 27.  United Securities was a member of FINRA until shortly after the Transfer Agreement, when its membership terminated due to its cessation of operations as a broker-dealer. See Jt. Stip. ¶ 25; see also Tr. of Prelim. Inj. Hr'g, June 20, 2008, at 3-4.  In naming Royal Alliance as a party to the arbitration, Branch Avenue alleged that Royal Alliance is a successor-in-interest to United Securities by virtue of the Transfer Agreement.

On May 7, 2008, Royal Alliance filed the instant action, seeking a declaration that it was not required to submit to arbitration and an injunction enjoining the arbitration proceedings from going forward against it.  The same day, Royal Alliance requested, via letter, that FINRA stay the arbitration

7

proceeding until the action in this Court was resolved.  See

Pl.'s Mot. Prelim. Inj., Decl. of Theodore J. Sawicki ("Sawicki

Decl."), Ex. C.  On May 28, 2008, via letter, FINRA summarily

denied the request for a stay.  See Sawicki Decl. Ex. F.  On June

4, 2008, Royal Alliance moved for a preliminary injunction

preventing the arbitration proceedings from going forward against

it pending the resolution of this action.  On June 20, 2008, a

preliminary injunction was entered.  The arbitration proceeding

has continued against United Securities and Ackerman without

Royal Alliance's participation.

## II. Discussion

### A. The Summary Judgment Standard.

Summary judgment is appropriate when, on the basis of the

pleadings, discovery materials, and any affidavits, there is no

genuine issue of material fact and the moving party is entitled

to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c);

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The

moving party bears the burden of demonstrating that no genuine

issue of material fact exists, and once the moving party meets

that burden, the non-moving party must demonstrate that such an

issue does, in fact, exist.  Bouchat v. Baltimore Ravens Football

Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  When a motion is

properly made and supported, the non-movant "must . . . set out

specific facts showing a genuine issue for trial," and "may not

8

rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). Evidence that is "merely colorable" or "not significantly probative" is insufficient to overcome a summary judgment motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The parties have stipulated to the relevant facts needed to resolve this action on summary judgment. See generally Jt. Stip.[5] Although there are a few facts that Branch Avenue alleges to be disputed, see Def.'s Resp. 3-4 ("Material Facts With Genuine Issue to be Litigated"), none of these facts are both material and disputed. Summary judgment is therefore appropriate.

## B. Deference to the Arbitration Panel.

A threshold question the parties dispute is whether the Court should defer to the arbitration panel to determine whether Royal Alliance is bound to arbitrate Branch Avenue's claims. Normally, courts give considerable deference to arbitrators in resolving matters related to a dispute that is subject to arbitration. However, when, as here, "there is a question regarding whether the parties should be arbitrating at all," Dockser v. Schwartzberg, 433 F.3d 421, 426 (4th Cir. 2006),

---

[5]The Joint Stipulation, Docket No. 29, did not conform precisely with the Court's rules for joint filings. However, it was electronically signed by counsel for both parties, who confirmed at oral argument that the Joint Stipulation represented facts to which both parties stipulated.

courts do not defer to arbitrators.  Rather, the Supreme Court
has stated unambiguously that "[t]he question whether the parties
have submitted a particular dispute to arbitration, i.e., the
'question of arbitrability,' is an issue for judicial
determination unless the parties clearly and unmistakably provide
otherwise."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79,
83 (2002) (emphasis added) (internal quotation marks omitted).

     Because Royal Alliance and Branch Avenue never entered into
an arbitration agreement, any requirement that Royal Alliance
submit to arbitration stems from the governing rules of FINRA -
either because of Royal Alliance's own membership in FINRA or
because of its alleged status as successor-in-interest to United
Securities, which was a FINRA member at the time of its dealings
with Branch Avenue.  Under FINRA Rule 12413, a FINRA arbitration
panel "has the authority to interpret and determine the
applicability of all provisions under the Code," and "such
interpretations are final and binding upon the parties."  FINRA
R. 12413.  Branch Avenue asserts that this language "clearly and
unmistakably" provides that questions of arbitrability must be
decided by the FINRA arbitrators.

     Although the Fourth Circuit has not addressed the scope of
Rule 12413, the majority of the Courts of Appeals that have
considered this issue have held that this broad language, by
itself, does not "clearly and unmistakably" empower arbitrators

10

to determine the question of arbitrability.  See John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 55 (2d Cir. 2001) (holding that one party's membership in NASD, and the resulting requirement that it adhere to the above rule, does not clearly and unmistakably submit questions of arbitrability to arbitrators); Miller v. Flume, 139 F.3d 1130, 1134 (7th Cir. 1998) (holding that the above rule does not constitute a clear and unmistakable grant of power to arbitrators to decide questions of arbitrability); Smith Barney, Inc. v. Sarver, 108 F.3d 92, 96-97 (6th Cir. 1997) (same); Cogswell v. Merrill Lynch, Pierce, Fenner & Smith Inc., 78 F.3d 474, 478 (10th Cir. 1996) (same); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cohen, 62 F.3d 381, 384 (11th Cir. 1995) (same).  But see FSC Secs. Corp. v. Freel, 14 F.3d 1310, 1312 (8th Cir. 1994) (holding that this language is, in fact, "clear and unmistakable"); PaineWebber Inc. v. Elahi, 87 F.3d 589, 601 (1st Cir. 1996) (noting that the language in this rule "strongly undercuts" arguments that a separate section of the NASD rules was an arbitrability issue that should be decided by courts and not arbitrators).

This Court will follow the majority view that FINRA Rule 12413, by itself, does not "clearly and unmistakably" grant arbitrators the authority to decide questions of arbitrability. Rule 12413 is a general provision providing arbitrators with the power to interpret their own rules.  It does not address issues

of arbitrability at all, let alone do so "clearly and unmistakably." See Carson v. Giant Food, Inc., 175 F.3d 325, 329 (4th Cir. 1999) (holding that "[t]he 'clear and unmistakable' test . . . requires more than simply saying that the arbitrator determines the meaning of any disputed contractual terms"). Accordingly, the Court will decide the question of arbitrability.[6]

### C. Branch Avenue's Bases for Claiming Royal Alliance Must Arbitrate Their Dispute.

Branch Avenue offers two theories as to why Royal Alliance must participate in the arbitration of its claims. Under the first theory, Royal Alliance, by virtue of its membership in FINRA, must adhere to FINRA Rule 12200, which requires members to arbitrate claims of all "customers." Under the interpretation urged by Branch Avenue, this FINRA rule applies even though it is undisputed that Branch Avenue has never been a customer of Royal Alliance. Under Branch Avenue's second theory, Royal Alliance

---

[6]Moreover, even if the Court were inclined to give some deference to FINRA's decision, via letter, to deny Royal Alliance's request for a stay of the arbitration, see Sawicki Decl. Ex. F, the letter, although noting that FINRA undertook "careful consideration of [Royal Alliance's] request," provides no indication as to whether FINRA considered the question of arbitrability. Indeed, it provides no reason for the denial at all. Cf. Goldman Sachs & Co., et al. v. Becker, No. C07-01599WHA, 2007 WL 1982790 (N.D. Cal. July 2, 2007) (finding, in a similar posture, that "[although] [t]he NASD did deny plaintiffs' motion to be excused from arbitration . . . there [was] little indication that the NASD actually took a close look . . . to see if there was an agreement or relationship that governed the question of arbitrability").

must arbitrate the claims as a successor-in-interest to United Securities, which is bound to arbitrate by virtue of its own membership in FINRA at the time of its dealings with Branch Avenue.  For the reasons discussed below, neither of Branch Avenue's arguments succeeds.

### 1. Branch Avenue as a "Customer."

Under FINRA Rule 12200, to which Royal Alliance must adhere as a member of FINRA, a FINRA member must arbitrate a dispute if three requirements are met:

- Arbitration under the Code is either
    (1) Required by a written agreement, or
    (2) Requested by the customer;
- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA R. 12200.

At issue between the parties is whether Branch Avenue qualifies as a "customer" who can require Royal Alliance to submit to arbitration.  The FINRA rules do not precisely define who a "customer" is, other than providing that a customer "shall not include a broker or a dealer."  FINRA R. 12100(i).  As a result, "[t]he key issue of who is a 'customer' [under FINRA and NASD rules] . . . has been the source of debate in numerous cases in which purported customers of . . . member firms sought to compel arbitration despite not having directly maintained

13

brokerage accounts or signed written agreements with the firms."
Deborah Buckman, Annotation, Who is "Customer" for Purposes of
National Association of Securities Dealers (NASD) Rule Requiring
NASD Member to Arbitrate any Dispute Between Customer and Member,
16 A.L.R. Fed. 2d 231 (2007).

Although it is undisputed that Branch Avenue has never been
a customer of Royal Alliance, Branch Avenue argues that under
Rule 12200, arbitration is available not only to "customer[s]" of
the FINRA member against whom arbitration is sought, but to
"customer[s]" generally.  Branch Avenue therefore claims that it,
as a "customer," can force Royal Alliance into the arbitration
proceeding because its dispute with Royal Alliance, a FINRA
member, arises in connection with the business of Royal Alliance
- namely, Royal Alliance's acquisition of United Securities.  See
Def.'s Mem. Cross-Mot. 6-7.

A court construing an arbitration clause should do so with a
presumption of arbitrability.  An order to arbitrate should not
be denied "unless it may be said with positive assurance that the
arbitration clause is not susceptible of an interpretation that
covers the stated dispute."  Wash. Square Secs., Inc. v. Aune,
385 F.3d 432, 436 (4th Cir. 2004) (internal citations omitted).

Even under this deferential standard, Branch Avenue's
reading of Rule 12200 is unpersuasive.  Numerous courts have held
that under the applicable FINRA (or NASD) rules, a customer of a

firm whose assets are subsequently acquired by another firm may
not compel the successor firm to arbitrate a dispute if, as here,
the events giving rise to the claim occurred before the
acquisition.  Rather, these courts have held that "customer"
status must be determined as of the time of the events underlying
the dispute.  See Wheat, First Secs., Inc. v. Green, 993 F.2d
814, 820-21 (11th Cir. 1993); Sands Bros. & Co. v. Ettinger, No.
03Civ.7854(DLC), 2004 WL 541846, at *3 (S.D.N.Y. Mar. 19, 2004);
Ryan, Beck & Co., LLC. v. Fakih, 268 F. Supp. 2d 210, 228-29
(E.D.N.Y. 2003); Prudential Secs., Inc. v. Dusch, No. 93-1470-
IEG(RBB), 1994 WL 374425, at *2 (S.D. Cal. Mar. 28, 1994);
Gruntal & Co., Inc. v. Steinberg, 837 F. Supp. 85, 92 (D.N.J.
1993); see also Miller, 139 F.3d at 1136 (agreeing with Wheat,
First Secs. that "an investor is not a 'customer' of an NASD firm
for purposes of claims that arose while the claimant was a
customer of a predecessor-in-interest, at least in the absence of
any contractual provisions to the contrary").[7]

---

[7]Branch Avenue's arguments against the applicability of the
Wheat, First Secs. line of cases are unpersuasive.  First, Branch
Avenue asserts that those cases rely on the "now obsolete and
superseded old NASD/FINRA Arbitration Rules [former NASD Rule
10301]."  Def.'s Mem. Cross-Mot. 5.  However, as Branch Avenue
concedes, see id. at 7, the substantive provisions of the former
NASD Rule and current FINRA Rule are consistent with regard to
the scope of matters that must be submitted to arbitration.
Alternatively, Branch Avenue asserts that the Wheat, First Secs.
cases are wrongly decided, see id. at 8, but fails to present any
supporting case law other than Wash. Square Secs., Inc. v. Aune,
which, as demonstrated below, is distinguishable.

Conversely, Branch Avenue has not cited any cases in which a court has construed Rule 12200 to allow a customer of a predecessor firm to sue a successor firm when the customer never dealt with the successor firm at all. The Fourth Circuit case cited by Branch Avenue in support of its argument, Wash. Square Secs., Inc. v. Aune, supra, is distinguishable. In Aune, the customers dealt with a broker who was authorized to sell securities on behalf of a NASD member but also sold securities on his own. See Aune, 385 F.3d at 433. The investors dealt only with the broker, but were under the impression he was acting on behalf of the NASD member, which he was not. See id. at 436. On those facts, the Fourth Circuit held that the NASD member was bound to arbitrate claims arising from the broker's outside dealings, even though the investors were not actually customers of the NASD member firm. See id. at 440. Specifically, the court held that under Rule 12200 (then NASD Rule 10301), (1) the phrase "between a customer and a member and/or associated person" encompasses disputes between a NASD member and a customer of an "associated person" of the member, and (2) the "business" of a NASD member includes the firm's supervision over associated persons. See id. at 436-37.

Here, unlike in Aune, the customer - Branch Avenue - never believed it was dealing with Royal Alliance, nor did it deal with an "associated person" of Royal Alliance. In addition, the

16

broker - Ackerman - never became associated with Royal Alliance
in any way.  Cf. USAllianz Secs., Inc. v. S. Mich. Bancorp, Inc.,
290 F. Supp. 2d 827, 831 (W.D. Mich. 2003) (holding that a NASD
member was bound to arbitrate claims related to a broker who
later became affiliated with the firm, even though the acts
giving rise to the claim took place before the broker's
affiliation).  On this record, there is simply no evidence of any
connection between Branch Avenue and Royal Alliance other than
Royal Alliance's acquisition of many of United Securities' assets
two years after the alleged misrepresentations made by United
Securities and its broker, Ackerman.  Accordingly, Branch
Avenue's first argument fails.

### 2. Successor-in-Interest Theory.

As a secondary argument, Branch Avenue maintains that even
if Rule 12200 does not directly require Royal Alliance to
arbitrate, Royal Alliance inherited United Securities' obligation
to arbitrate under FINRA because Royal Alliance is a successor-
in-interest to United Securities under state common law.
However, the facts in this record do not support the conclusion
that Royal Alliance is a successor-in-interest to United
Securities, and as such, it cannot be compelled to arbitrate
under Branch Avenue's second theory.

Although the parties dispute whether New York or Virginia
law controls the successor-in-interest analysis, it is

17

unnecessary to resolve this question because Virginia and New York law on successor liability is essentially the same. Under the law of either state, a corporation that acquires the assets of another corporation does not automatically succeed to the predecessor's liabilities. Rather, successor liability arises under only four circumstances: (1) the purchasing corporation expressly or impliedly assumes the predecessor's liabilities, (2) the transaction amounts to a consolidation or merger, including a de facto merger, of the seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the purchase transaction was fraudulent and was made in order to escape obligations. See Schumacher v. Richards Shear Co., Inc., 451 N.E.2d 195, 198 (N.Y. 1983); Harris v. T.I., Inc., 413 S.E.2d 605, 609 (Va. 1992).

Neither party argues or suggests that the first and fourth circumstances are relevant here. Branch Avenue has not asserted that Royal Alliance expressly or impliedly assumed United Securities' liabilities. Indeed, the Transfer Agreement explicitly provides that "[Royal Alliance] expressly does not, and shall not, assume or be deemed to assume . . . any liability, claim, obligation, commitment, undertaking, expense or agreement of [United Securities]." Transfer Agreement ¶ 2.1(c). In addition, Branch Avenue has not claimed that the Transfer Agreement was fraudulent.

18

Rather, Branch Avenue argues that Royal Alliance was a "mere continuation" of United Securities, or, alternatively, that United Securities and Royal Alliance entered into a de facto merger. Def.'s Resp. 6-11.[8] Branch Avenue supports this position by pointing out, among other things, that two owners of United Securities, Jones and Sutherland, are now "managing executives" with Royal Alliance, that United Securities engaged in a "mass registration transfer of all its registered representatives" to Royal Alliance, that United "effectively . . . cease[d] operations as a retail broker-dealer," that United's offices were "absorbed" into Royal Alliance, and that Royal Alliance termed the transaction an "investment" in United Securities. Id. 8-9.

Under New York law, the "mere continuation" exception applies "where only one corporation survives the transaction; the predecessor corporation must be extinguished." Schumacher, 451 N.E.2d at 198. The exception does not apply where the predecessor corporation "survive[s] the . . . purchase agreement as a distinct, albeit meager, entity." Id. Here, the undisputed facts are that United Securities still exists, has between eleven and fifty employees, and manages $100 million in assets. Under these facts, Royal Alliance is clearly not a mere continuation of

_____

[8]Branch Avenue principally argues the de facto merger point. Given that the elements of a mere continuation and a de facto merger are similar, this discussion addresses both contentions.

United Securities under New York law.

Under Virginia law, the key element of "mere continuation" is "a common identity of the officers, directors, and stockholders in the selling and purchasing corporations." Harris, 413 S.E.2d at 609. "When . . . the purchase of all the assets of a corporation is a bona fide, arm's length transaction, the 'mere continuation' exception does not apply." Id.; see also Crawford Harbor Assoc. v. Blake Const. Co., Inc., 661 F. Supp. 880, 885 (E.D. Va. 1987) (noting that the mere continuation exception requires that the "legal and economic ownership be essentially the same both before and after the transaction"). Here, the elements of a mere continuation are not satisfied. According to the undisputed evidence in the Form ADV filed with the SEC, there is no common identity of ownership. United Securities currently lists eight owners, including Jones and Sutherland, whereas Royal Alliance is wholly owned by AIG. See Pl.'s Opp'n. & Reply 13-14. There is insufficient common identity of directors, as at most two principals of United Securities - Jones and Sutherland - are now officers of Royal Alliance.[9] Finally, there is no evidence in the record that the

---

[9]Royal Alliance asserts that Jones and Sutherland are not officers of Royal Alliance because they are actually independent contractors. See Pl.'s Opp'n & Reply 14. It is unnecessary to decide this issue because the transfer of two officers is not enough to establish a mere continuation in light of the other evidence in the record.

stockholders of United Securities are now stockholders of Royal
Alliance.   In sum, Branch Avenue has provided no evidence to
support a view of Royal Alliance as a "mere continuation" of
United Securities under either New York or Virginia law.

Similarly, the evidence fails to establish that there has
been a consolidation or de facto merger of United Securities and
Royal Alliance.   Although neither the New York Court of Appeals
nor the Virginia Supreme Court has explicitly defined the
elements of a de facto merger, courts in both jurisdictions are
in basic agreement as to four factors a court should consider:
"(1) continuity of ownership; (2) a cessation of ordinary
business and dissolution of the predecessor as soon as
practically and legally possible; (3) assumption by the successor
of the liabilities ordinarily necessary for the uninterrupted
continuation of the business of the predecessor; and (4) a
continuity of management, personnel, physical location, assets,
and general business operation."   Sweatland v. Park Corp., 181
A.D.2d 243, 245-246 (N.Y. App. Div. 1992); see Blizzard v. Nat'l
R.R. Passenger Corp., 831 F. Supp. 544, 547 (E.D. Va. 1993).[10]

---

[10]Blizzard lists the four factors as "(1) a continuity of
the selling corporation's enterprise, including continuity of
management, personnel, physical location, assets, and general
business operations; (2) a continuity of ownership because the
purchasing corporation acquires the assets with shares of its own
stock, which ultimately are held by the selling corporation's
shareholders; (3) prompt liquidation and dissolution of the
selling corporation's business operations; and (4) an assumption
by the purchasing corporation of the selling corporation's

21

Of the four factors, continuity of ownership is the most
important.  See Wash. Mut. Bank, F.A. v. SIB Mtge. Corp., 21
A.D.3d 953, 954, (N.Y. App. Div. 2005) ("continuity of ownership
is the essence of a merger"); Blizzard, 831 F. Supp. at 547 ("The
key element of a de facto merger is . . . a continuity of
ownership corporations").[11]  The de facto merger exception is
generally invoked if the successor corporation takes all of the
predecessor's assets without consideration, or if consideration
consists wholly of shares of the purchaser's stock which are
promptly distributed to the seller's shareholders when the seller
liquidates.  Crawford Harbor, 661 F. Supp. at 884.

Here, the most important factor, continuity of ownership, is
not present.  As mentioned above, Royal Alliance is wholly owned
by AIG, while United Securities has eight owners, none of whom
include AIG.  Under the Transfer Agreement, the assets of United
Securities were purchased for cash, not for shares of stock in
Royal Alliance.  In addition, although significant portions of
United Securities have been purchased and are now owned and

---

obligations necessary for normal operation of the seller's
business."  Blizzard, 831 F. Supp. at 547.  Essentially the same
four factors as in Sweatland, they comprise "the traditional view
of the de facto merger exception."  See id.

[11]Some courts have relaxed the continuity of ownership
requirement specifically in products liability cases.  However,
neither New York nor Virginia has adopted the "products line
exception," and in any event, this is not a products liability
case.

operated by Royal Alliance, United Securities still exists as an independent company and manages its own accounts, including the Branch Avenue account.   Thus, Royal Alliance and United Securities did not engage in a de facto merger.

Finally, as this Court has previously observed, "the successor-in-interest doctrine is employed to prevent the transferor business from fraudulently escaping outstanding debts and liabilities."   Precision Franchising LLC v. Pate, No. 1:07cv407 (LMB/BRP), 2007 WL 3231551, at *7 (E.D. Va. Oct. 31, 2007).   No evidence suggests that this has occurred here.   Royal Alliance purchased a significant portion, but not all, of United Securities - its entire broker-dealer operation.   A large and significant asset transfer, however, does not necessarily implicate the successor-in-interest doctrine.   Moreover, at no time has Branch Avenue asserted, nor does any evidence show, that United Securities has become incapable of paying off its creditors as a result of the Transfer Agreement.   Indeed, there is nothing to suggest that United Securities was any less capable of paying debts or claims after the Transfer Agreement than before.   As such, the rationale underlying the successor-in-interest doctrine is not present.

### III. Conclusion

For the reasons stated above, Royal Alliance cannot be compelled to arbitrate Branch Avenue's claims against it.

23

Accordingly, plaintiff Royal Alliance's motion for summary judgment will be granted, and defendant Branch Avenue's cross-motion for summary judgment denied, by an Order to be issued with this opinion.

Entered this 20th day of November, 2008

Alexandria, Virginia

_____ /s/
Leonie M. Brinkema
United States District Judge

24